UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LINDA L. HOWLAND,

                                            Plaintiff,

-vs-

UNIVERSITY of ROCHESTER,
PAYCHEX,

                                            Defendants.
_____

DECISION and ORDER

19-CV-6532 CJS

INTRODUCTION

Linda Howland ("Plaintiff") commenced this action, proceeding *pro se*, alleging that her employment with defendant University of Rochester ("the University") was retaliatorily terminated after she expressed concern that the University was engaged in illegal activity. Now before the Court are motions to dismiss by the University and defendant Paychex ("Paychex"). The applications to dismiss are granted.

BACKGROUND

On July 18, 2019, Plaintiff filed a Complaint (ECF No. 1) containing allegations of sexual harassment and retaliation by her former employer, the University, but not of the type usually alleged in a Title VII or Title IX employment discrimination action. Instead, the pleading alleged that Plaintiff's male supervisor "sexually harassed" her in order to retaliate against her after she discovered that the University was involved in an illegal conspiracy with its largest corporate donor, Paychex, to commit fraud, money laundering and sex-trafficking. In pertinent part, the Complaint stated:

> While working at the University of Rochester I went to the appropriate channels to report sexual harassment by my boss and crimes I learned

1

> about related to money laundering the University was participating in with the use of stolen and fake ID's and included their [the University's] biggest donor, Paychex. I gave them examples and descried how the efforts were defrauding the federal government. They subsequently put me on a performance improvement plan when I did not have performance issues and had received a raise in July for good performance. They fired me for reporting the fraud to the Fed in retaliation. I went to EEOC and they said to sue.
>
> ***
>
> [On June 3, 2019,] I went to the Title IX coordinator Morgan Levy and Human Resource Representative Holly Wolk with allegations of sexual harassment by my boss Tom Anderson in Dec 2018. I told Morgan and Holly I though my boss's actions toward me were in retaliation for me pointing out criminal activity at the University which involved Paychex, the University's largest donor. I told them I knew about money laundering at the University and activity that included drug and sex trafficking and use of stolen and fake ID's to support the illegal activity. I described use of Federal Funds to provide cash back to donors supporting tax evasion and a larger scheme intended to defraud the U.S. Government. They took the information, put me on a performance improvement plan 4/1-6/30 and fire me 5/23. I did not have performance issues. I also told about fears in my job I thought was intended to scare me because I knew about the fraud. This is a federal claim because of conspiracy to defraud U.S. and damages I am seeking as a result of their retaliatory actions in firing me for reporting fraud and conspiracy.

Compl. at pp. 1, 3–4. When asked, on the form complaint that Plaintiff used, to state the basis for federal jurisdiction, she wrote: "I understand 923.18 U.S.C. § 371 [sic] Conspiracy to Defraud the U.S. is a federal offense." On the Civil Cover Sheet filed along with her Complaint, Plaintiff checked a box indicating that she was alleging a conspiracy under the Racketeer Influenced Organizations ("RICO") statute.

In lieu of filing answers, Defendants each filed motions to dismiss the Complaint for failure to state a claim. (ECF Nos. 3, 8). The University argued, *inter alia*, that while the Complaint alleges "that each named defendant participated in a 'conspiracy' to defraud the United States, money laundering, drug and/or sex trafficking, tax evasion,

2

and using stolen and fake identification to support illegal activity," "[n]one of the allegations in the present litigation are even remotely plausible, and none have been pleaded with the requisite specificity needed to support viable conspiracy or civil RICO claims."  The University further indicated that there is no private right to sue under the criminal statute cited by Plaintiff, 18 U.S.C. § 371, and that Plaintiff had not filed a RICO case statement as required by Rule 9 of the Local Rules of Civil Procedure.   Paychex made similar arguments in support of its motion to dismiss, and further indicated that it had never been properly served with the Summons and Complaint.  Additionally, Paychex indicated that it could have no liability for retaliatorily terminating Plaintiff's employment since it never employed her.

On August 30, 2019, Plaintiff filed a letter purporting to clarify the federal basis for her lawsuit.  In that regard, Plaintiff  stated that she was attempting to assert a federal "employment discrimination" claim, stating:  "My claim remains the same that my civil rights were violated and I was discriminated against for coming forward in reporting crimes and behavior towards me which was sexually offensive and alarming for my safety and well-being as a result of bringing forward information about criminal activity.  . . .  I have documentation to support from the EEOC as well as a history of documents I have saved to support the atrocities that I suffered while employed at the University of Rochester." ECF No. 12.

Also, on August 30, 2019, Plaintiff filed another letter (ECF No. 13) responding to Defendants' motions in which she again described the nature of her claim, stating:

> I told my boss about crimes I was aware of from a previous job that involved Paychex and the use of made-up and stolen identities for the purposes of laundering money.  I was aware of that same activity at the University of Rochester in the data I used for the purposes of my job.  I told him I had

3

> experienced some odd visits in my job and in my travels on behalf of the University and I was afraid. I told him the data that was assigned in my territory I thought was designed to intimidate me because I knew about the crimes and had previously reported them to Federal Authorities. I told him the amount of money that as being laundered was massive and it was very dangerous. I told him Paychex Corporation was behind much of the operations and they were one of the University's biggest donors. I was worried I was being threatened and described some visits, accidents and names of people in my territory I was expected to visit and whom I knew were not real people. I cited some examples including as I recall: James P Morgan, Mahatma Ghandi, Gouri Madwar, Francis Coppola, the Google CEO I knew was not the CEO (George Pantelis) and some others. I told him much of the data had overt sexual connotations and was offensive and I new it was fake and wondered how I could be expected to raise money from the data and if I was in danger. I asked if I should go to HR although I was worried about losing my job. He told me to ignore it. After that my boss's behavior towards me changed and I found him to be sexually offensive. I went to the Title IX Coordinator and Human Resources. They told me they would investigate and set up a meeting to discuss. I told them about my boss's behavior after reporting the crimes to him and I told them about the money laundering. I gave them examples of some names. They said they would look into it. I had a feeling I was going to get fired so I sent them a note I wanted them to forget it. I made a mistake. They came back and said we can't find reason for sexual harassment. We would like to see the examples of the scheme you described. I met with Human Resources for several hours and in detail explained to them how the fraud works and how Paychex (one of the larges donors) [is] involved. I gave them specific examples. I was subsequently put on a performance improvement plan and fired before the plan ended despite the fact I was meeting the plan requirements. I went to the EEOC and filed a complaint. They instructed me that based on what I described they would have a hard time proving sexual harassment. They told me I should pursue a lawsuit based on the other facts I presented issued [sic] and issued a right to sue letter.

Plaintiff further reiterated her belief that federal subject-matter jurisdiction exists since her claim involves a matter of "public policy," insofar as she maintains that she was fired both for reporting criminal activity and for reporting sexual harassment. *Id.* at p. 2 ("a. Public Policy was violated. i. Firing an employee because they reported illegal misconduct that

4

they observed in the company or business; ii. Termination of employee for reporting alleged unlawful conduct by employer. Sexual harassment.  b. This also may be discrimination for retaliation for making complaints of sexual harassment.").

On September 10, 2019, Plaintiff filed a document (ECF No. 19) intended as a response to Defendants' motions and a cross-motion for leave to file an Amended Complaint.  In the cover letter attached to the proposed Amended Complaint, Plaintiff indicated that she was "re-stating" her claims as arising under "18 U.S.C. Section 24[1] Conspiracy Against Rights" and "18 U.S.C. § 1514A(a) Whistleblowing."  Plaintiff further stated that her claims involve a "federal question" because they involve "public policy" insofar as Defendants "fir[ed] an employee because [she] reported illegal misconduct that [she] observed in the company or business" and they "termina[ted] an employee for reporting an alleged unlawful conduct by employer."  As for factual allegations, the proposed Amended Complaint states in pertinent part:

> [While employed at the University,] I went to the Title IX coordinator and human resources to tell them I though I may have been sexually assaulted by my boss Tom Anderson.  I told them his behavior toward me was retaliatory for my reporting to him crimes I was aware of regarding money laundering that the University and Paychex w[ere] engaged in.  I told them I thought he was trying to fire me because I told him I was scared in the job and thought I was being intimidated by data and incidents that happened during my travel on behalf of the University.  My boss told me to ignore it. We traveled together to Florida and I though he set appointments designed to offend me and may have assaulted me after possibly being drugged. They ignored my requests to transfer. . . .  I would like compensation for mental stress and ultimately what resulted in lost wages as they fired me after I showed them specific examples of money laundering. . . . On 5/23/19 Tom Anderson and Holly Wolk fired me for failure to meet objectives in a Performance Improvement Plan I was placed on in retaliation for my meeting with Holly and Christine to give examples of the money laundering at the University through the use of stolen and fake IDs plus scholarship fraud that involved the University's biggest donor, Paychex.  I had a good

> performance history and had just received a raise and promotions. They put me on warning the same day I gave them the examples of fraud. I argued my performance was good. They fired me before the end of the plan period because I was meeting the goals and they were worried I would achieve them.

Am. Compl. at p. 4.

On September 25, 2019, Paychex filed a motion (ECF No. 23) captioned as a motion to dismiss the Amended Complaint. In that regard, Paychex indicates that insofar as Plaintiff filed the Amended Complaint without first seeking leave from the Court the pleading should be stricken, and, alternatively, to the extent that Plaintiff is seeking leave to amend, her application should be denied as futile both because the pleading fails to state a claim and because Plaintiff has never properly served Paychex. Paychex indicates that the proposed amended pleading purports to assert claims under 18 U.S.C. § 241 and 18 U.S.C. § 1514A, neither of which statute permit a claim against Paychex. *See*, Paychex Memo of Law, ECF No. 23-4 at pp. 2, 4, 7 ("In her new pleading, Plaintiff purports to proceed under the criminal conspiracy against rights statute, see 18 U.S.C. § 241, and the whistleblower provisions of the Sarbanes-Oxley Act. See 18 U.S.C. § 1514A. … [However,] there is no private right of action to enforce the criminal conspiracy against rights statute, and whistleblower protections do not apply against Paychex because Paychex is not and has never been Plaintiff's employer (nor has Plaintiff alleged an employment relationship with Paychex). . . . In any event, courts are without jurisdiction to adjudicate claims arising under the whistleblower provisions of the Sarbanes-Oxley Act where the plaintiff does not first file a complaint with the Secretary of Labor. *See* 18 U.S.C. § 1514A(b)(1); *see also Murray v. TXU Corp.*, 279 F. Supp. 2d 799, 802 (N.D. Tex. 2003) ("A federal district court lacks jurisdiction . . . if . . . the plaintiff failed to file a complaint

with the Secretary of Labor").").)  Paychex reiterates that Plaintiff has failed to state any type of RICO claim, and further states that she has also not pled an employment discrimination claim against Paychex under either Title VII or Title IX since she was never employed by Paychex.  Finally, Paychex reasserts its argument that the summons that was served is defective. *See*, Paychex Memo of Law, ECF No. 23-4 at p. 12 ("As Paychex argued in its motion to dismiss the Original Complaint, Plaintiff largely failed to observe Rule Four in completing the Summons. The Summons does not name the Court, it does not contain Plaintiff's address, and it does not bear the Court's seal.").

On October 4, 2019 and October 7, 2019, respectively, Plaintiff filed additional submissions (ECF Nos. 26, 27) relating to the motions to dismiss.  The two documents, which are identical and consist of eleven pages, purport yet again to explain Plaintiff's claim and "the bigger picture" of the alleged criminal wrongdoing that she claims to have uncovered.   In this regard, Plaintiff begins by explaining that prior to being employed by the University she was employed by the Consumer Credit Counseling Service of Rochester which, she maintains, was itself engaged in "money laundering, restraint of trade, mortgage fraud, sex and drug trafficking, credit card fraud, bank fraud, investment fraud and tax fraud."  Plaintiff maintains that the University and Paychex were both involved in this criminal activity by Consumer Credit Counseling Service, and that when she complained to the Securities and Exchange Commission about Consumer Credit Counseling Service, she was fired.  Describing her firing by Consumer Credit Counseling, Plaintiff states:

> I reported this to the SEC and was subsequently asked to resign in 7/11. The Board chose 7/11 because it was representative of the ATM machines used in dispersing counterfeit cash.  Paychex Corp Headquarters at 9/11 is not by accident.  9/11 attacks on Twin Towers were significant historically

> to the Annapolis Treaty and Convention regarding Investment Fraud in the Federal Government. That date was chosen to attack the Twins signifying what would be the collapse of NY as the Financial Capital of the World.

ECF No. 26.

Plaintiff states that after she began working at the University, she began to recognize connections between the University and Paychex and the illegal conduct by the Consumer Credit Counseling Service, which she reported to her "boss" Tom Anderson. Regarding Anderson's alleged subsequent sexual harassment, Plaintiff states:

> After our discussion his behavior towards me changed and I sensed he might be trying to fire me because of what I had told him. We took a work trip to Florida and I was mortified at the experience and thought it was possible I may even have been drugged and assaulted by my boss as well as the mental intimidation from the visits during the trip.

*Id.* Fearing that Anderson might try to fire her, Plaintiff went to the University's Title IX coordinator and to human resources and asserted that Anderson was receiving "kickbacks" and that he may have sexually assaulted her. *Id.* ("I told them about my boss's behavior toward me and possible assault during the Florida trip and odd circumstances in visits."). Plaintiff states that when she was asked to explain to University officials why she believed there was criminal wrongdoing occurring, she made statements including the following:

> I described identifiers in the data like, ISIS, Harris, Burn which were identifiers from my previous job indicative of the money laundering and that it was not a coincidence.

> I showed illustrations of accounts that were offensive with references to my family, organized crime, sex, drugs, Swiss bank accounts which I thought was all designed to scare me.

\*\*\*

> I told them [I] had my passport stolen at a Hilton hotel on Annapolis Way shortly after completing some research on 9/11 and learning about the significance of the terrorist attacks on the Twin Towers. I didn't think it was a coincidence.

*Id.* Plaintiff further states that she offered examples of names of alumni/donors that she felt were "fake" and related to the alleged criminal conspiracy, stating for example:

> Richard Carlson, Ron Hess, Al Baker, Connor Hess, George Publow - laundered money through the scholarship fraud with Connor Hess. The references to AL Baker is a fake student – meaning family (AL = Muslim origins) and Baker references the drug traffic. George Publow a member of the fraternity furthering the money laundering of fraternity members. Publow the father of "blow" and acronym for cocaine. I told HR I thought Mr. Hess was a plant and invited me to his house for Dog Hair and Courvoisier. We had dinner at a restaurant I believe was staged nearby his house. I was concerned and told HR I mentioned to Tom Anderson and was worried about visiting Mr. Hess alone.
>
> Reverend McFarlane – coincidentally scheduled to visit me in VA and while en route a hole was put in the gas tank of my car and I was nearly killed. Thankful I was in the farlane [sic] on a 4 lane highway. Mc – in reference to the UK evergreen plan. This was not an accident. Jill Cotter made the travel arrangements through National which was unusual. She said there "was no cars available at Enterprise." I suspect a further mockery to the dms biblical references to the bible and no room at the inn. I had significant research on the laptop of the correlation of the University origins and the Muslim Christian movement to have ultimate power.
>
> ***
>
> George Pantelis – listed in the data as CEO of Google. Mr. "pantyless" is not the CEO of Google. This was a plant and a mockery. The student a fake likely fed money running through the account in the form of student loans which would default causing financial burden to the Fed.
>
> Robin and Sam Smith – highly offensive discussion about female gene Talia [(presumably meaning female genitalia)] and obgn procedures. Sam Smith a UK performer who came out of the closet as being gay. I'm not sure of the significance of this other tha[n] to be offensive in the conversation. I confronted my boss about this as well. Smiths I believe were receiving kickbacks from their gifts to the University. Smith from my research was the

> common name used in the money laundering.  Sam representative of the IRS who is defrauded and Smith the anonymous gift to MIT from George Eastman who started the business and invested fraud in Universities.

*Id.*

As a further example of information that Plaintiff provided to her supervisors at the University to document her suspicions about illegal activity, Plaintiff provided the Court with "Exhibit B," entitled "Some other references of data I have worked with and question the validity.  I make notes on the documents reminding me of patterns I believe identify as fake accounts and ones designed to intimidate me," which states, for example:

> Robin Williams – Is an actor who killed himself not likely an alumnus another plant.
>
> Francis Coppola- Is a movie director coincidentally with the same name of an alumnus in the real estate business which is defrauding the fed.  This was designed to intimidate me.
>
> \*\*\*
>
> Monte Levitt -  Monte from the movie the full monte which has much nudity and I suspect I have been drugged and photographed in compromising circumstances although I cannot prove that. . . .  I suspect Mr. Levitt was a plant it could be possible I was drugged and assaulted although I am not certain.
>
> \*\*\*
>
> Navin Nanda -  from India and a Dr. in Birmingham.  I do not believe Dr. Nanda is a legitimate heart surgeon and was part of a illegal drug dealing operation funded by Money Management International through MMI docs who perpetuate the drug and sex traffic.  I had this also documented in the laptop.  The University knew of it.  Nandas were posing as doctors.

ECF No. 26.  In several of her written entries, Plaintiff indicated that the alleged impostors were acting in conjunction with the "Howlands," referring to the family of her ex-husband.

Plaintiff reiterates that after making these statements, she was placed on a performance improvement plan, purportedly because her fundraising numbers were too

low, and then fired prior to the completion of the performance review plan. ECF Nos. 26, 27.

On October 15, 2019, the University filed a further submission (ECF No. 28) in support of its motion to dismiss and in opposition to the proposed amended pleading. The University essentially reiterates the arguments in its original motion, and maintains that the proposed amended pleading does not, and cannot, cure the defects in the original Complaint.

The Court has carefully considered the parties' submissions.

## ANALYSIS

Petitioner's *Pro Se* Status

Since Petitioner is proceeding *pro se*, the Court has construed her submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). In this regard, when evaluating the legal sufficiency of the Complaint and the proposed Amended Complaint, the Court has considered all of Plaintiff's written submissions to the Court, many of which explain and amplify the rather sparse allegations in the pleadings.[1]

Motions to Appoint Counsel

The docket presently indicates that Plaintiff has two pending motions for appointment of counsel. (ECF Nos. 2 & 14). Incidentally, at an appearance on September 5, 2019, the Court strongly encouraged Plaintiff to retain an attorney in this matter, to no avail. Plaintiff has insisted that it is impossible for her to find an attorney in

---

[1] Those documents may be considered on a Rule 12(b)(6) motion since they are documents attached to the complaint or incorporated in it by reference or documents "integral" to the complaint and relied upon in it.

11

the Rochester area who is willing to represent her against these Defendants, purportedly since Defendants are too powerful and the criminal conspiracy in which they are involved is too far-reaching.[2]  Alternatively, Plaintiff has expressed the belief that her ex-husband's family is powerful and exerts influence that would prevent an attorney from representing her.   Neither of these explanations correspond to objective reality.

In any event, the Court previously indicated that it is declining to appoint counsel for Plaintiff. *See*, Text Order, ECF No. 32.  In that regard, although there is no constitutional right to appointed counsel in civil cases, under 28 U.S.C. § 1915(e), the Court in its discretion may appoint counsel to assist indigent litigants. *See, e.g., Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988). The factors to be considered include whether: (1) the claims are likely to be of substance; (2) the indigent is able to investigate the crucial facts concerning his claim; (3) conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) the legal issues involved are complex; and (5) there are any special reasons why appointment of counsel would be more likely to lead to a just determination. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (citing *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986)).

Here, the Court notes, preliminarily, that Plaintiff is not indigent.  In that regard, Plaintiff, who paid the filing fee in this action, belatedly submitted a motion for leave to proceed *in forma pauperis*, ECF No. 15.  However, Plaintiff's financial affidavit establishes that she has significant assets and is not indigent.  Beyond that, the relevant factors do

---

[2] The Court observes that according to its electronic docketing program, CM/ECF, there has been no shortage of actions filed against these two defendants by plaintiffs who were represented by attorneys, contrary to Plaintiff's belief.  Indeed, there are numerous such cases currently pending against the University, and one pending against Paychex.

12

not warrant the appointment of counsel here. In particular, as will be discussed further below, Plaintiff's claims are most definitely not "likely to be of substance." Indeed, the Court has little doubt that the true reason that Plaintiff has been unable to retain an attorney to represent her against these "deep pocket" Defendants is that her claims are indisputably frivolous. Consequently, the applications for appointment of counsel (ECF Nos. 2 & 14) and the application for leave to proceed *in forma pauperis* (ECF No. 15) are denied.

<ins>Motions Under Rule 12(b)(6)</ins>

The legal standards to be applied on a motion to dismiss pursuant to Rule 12(b)(6) are clear:

> To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. May 1, 2018).

> In its review, the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. Jun. 3, 2014) (citations and internal quotation marks omitted).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

13

will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).

"[A]s *Iqbal* makes clear, a plausible claim must come before discovery, not the other way around." *Angiulo v. Cty. of Westchester,* No. 11-CV-7823 CS, 2012 WL 5278523, at *3 (S.D.N.Y. Oct. 25, 2012) (citation omitted); *see also, McBeth v. Porges*, 171 F. Supp.3d 216, 236 (S.D.N.Y. 2016) (Observing that pursuant to *Iqbal*'s pleading

14

standard, "the Federal Rules of Civil Procedure do 'not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions or speculation.' ") (quoting *Iqbal* ).

Significantly, for purposes of the instant case, "[e]ven a well-pleaded complaint may be dismissed as factually frivolous if the sufficiently well-pleaded facts are clearly baseless—that is, if they are fanciful, fantastic, or delusional." *Igarashi v. Skulls & Bones*, 438 Fed.Appx. 58, 2011 WL 4907286 (2d Cir. Oct. 17, 2011) (quoting *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (internal quotation marks omitted) ); *see also, AJ Energy LLC v. Woori Bank*, 829 F. App'x 533, 534 (2d Cir. 2020) ("A district court, however, need not credit conclusory allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), nor suspend common sense when analyzing the complaint, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). "A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.' " *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Denton v. Hernandez*, 504 U.S. 25, 32-33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)). In doing so, a court may dismiss claims that are "implausible in light of factual allegations in the pleading itself." *Krys v. Pigott*, 749 F.3d 117, 133 (2d Cir. 2014).").

Here, the Court concludes that, from the excerpts set forth above, especially those taken from ECF No. 26, Plaintiff's claims are "fanciful," "fantastic" and "delusional." In this regard, Plaintiff was hired by the University to meet with and solicit donations from wealthy alumni. Instead, Plaintiff formed the unreasonable belief, based on what can only be described as irrational interpretations of objectively innocuous information, that many of the alumni whom she had been instructed to meet with were "plants," that is, fictional characters and/or participants in a criminal conspiracy involving the University, the

15

University's largest corporate donor (Paychex), her former employer (Consumer Credit Counseling Service) and her ex-husband's family ("the Howlands").  Plaintiff further concluded that the same innocuous information contained threats directed at her and her family, veiled sexual references, mockery of her, and connections to the terrorist attacks on September 11, 2001.  Plaintiff also formed the belief that she may have been sexually assaulted, both by certain alumni and by her supervisor, Tom Anderson, though she admittedly had no proof of that and was not even certain that an assault had occurred. When Plaintiff expressed these distorted beliefs, in damning detail,[3] to officials at the University, she was, not surprisingly, terminated.[4]  Plaintiff's allegations in the Complaint and proposed Amended Complaint fail to state any type of non-frivolous claim against the University, let alone against Paychex.

Even assuming *arguendo* that Plaintiff's claims are not so fanciful, fantastic and delusional on their face to warrant dismissal, the pleadings nevertheless fail to state actionable claims.  In that regard, after several tries Plaintiff has not *plausibly* alleged that either Defendant engaged in criminal wrongdoing or conspired to violate her rights, even assuming the criminal statutes she cites allowed a private right to sue. *See, e.g., Storm-Eggink v. Gottfried*, 409 F. App'x 426, 427 (2d Cir. 2011) ("[T]o the extent that Storm–Eggink sought to pursue claims under 18 U.S.C. §§ 241 and 242, both criminal statutes, we have held that there is no private right of action under § 242, while nothing in the language or structure of § 241 suggests that Congress intended to create a private right

---

[3] *See*, ECF No. 26.
[4] What is surprising to the Court is that Plaintiff was placed on a performance improvement plan rather than terminated immediately (or urged to obtain treatment).  Indeed, as noted earlier, even Plaintiff realized that the likely result of her explanation was that she would be fired. *See*, ECF No. 13 ("They said they would look into it.  I had a feeling I was going to get fired so I sent them a note I wanted them to forget it.  I made a mistake.").

of action under that section[.]"). Nor has Plaintiff stated a "whistleblower" claim under 18 U.S.C. § 1514A(a), since, for example, Plaintiff was never employed by Paychex and her former employer, the University, is not a "publicly traded company."[5]

Neither has Plaintiff plausibly alleged an employment-discrimination retaliation claim[6] under either Title VII or Title IX.[7] In that regard, while Plaintiff makes a vague allegation of a "possible" sexual assault by her supervisor, the allegation is not plausible since she admits she is not sure that it ever happened. *See*, ECF No. 26 ("[I]t could be possible I was drugged and assaulted although I am not certain."). Also detracting from the plausibility of that allegation is the fact that Plaintiff makes the same bald and vague allegations concerning "possible" assaults by alumni with whom she met as part of her job.[8] Similarly, Plaintiff's references to other incidents that she found to be "sexually offensive" are, according to her own statements, circumstances in which she irrationally took offense at objectively innocuous information and events. *See, e.g.*, ECF No. 13 ("[M]uch of the data had overt sexual connotations and was offensive and I knew it was fake and wondered how I could be expected to raise money from the data and if I was in danger."); *see also*, ECF No. 26 ("George Pantelis – listed in the data as CEO of Google.

---

[5] *See*, ECF No. 28 at p. 9 ("The University is not, and never has been, a publicly traded company. (*See* Dkt. 16 [Corp. Disclosure Stmt.]). It is, therefore, not subject to this provisions of Section 1514A(a).").
[6] Plaintiff has obviously not stated such a claim against Paychex, which never employed her.
[7] *See, Holcomb v. State Univ. of New York at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017) ("Title VII and Title IX are governed by the same substantive standards for reviewing claims of ... retaliation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013).); *see also, Robinson v. Goulet*, 525 F. App'x 28, 31 (2d Cir. 2013) ("To establish a retaliation claim under Title VII, a plaintiff must demonstrate that (1) she participated in a protected activity; (2) that activity was known to the defendant; (3) the defendant took an employment action that disadvantaged the plaintiff; and (4) a retaliatory motive played a part in the adverse action. *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir.2006)."); *Malacarne v. City Univ. of New York*, 289 F. App'x 446, 447 (2d Cir. 2008) ("[A]n illegitimate, retaliatory motive must be a "at least a substantial or motivating factor" in the adverse action.").
[8] *See*, ECF No. 26 ("Monte Levitt -  Monte from the movie the full monte which has much nudity and I suspect I have been drugged and photographed in compromising circumstances although I cannot prove that. . . .  I suspect Mr. Levitt was a plant it could be possible I was drugged and assaulted although I am not certain.").

Mr. "pantyless" is not the CEO of Google. This was a plant and a mockery."). Consequently, Plaintiff has not plausibly alleged that she actually experienced sexual harassment, or that she could have reasonably believed that she had.

Nor has Plaintiff plausibly alleged that the termination of her employment had anything to do with her complaint about alleged sex harassment. Instead, Plaintiff maintains that the alleged retaliation, which consisted of the alleged sexual harassment by her supervisor[9] and the termination of her employment, occurred in response to her statements about the alleged criminal activity. *See*, Proposed Am. Compl. at p. 4 ("They fired me after I showed them specific examples of money laundering."). No reasonable inference of impermissible retaliatory termination or discrimination can be drawn from Plaintiff's papers. Rather, the reasonable inference that fairly leaps off the pages of Plaintiff's submissions is that her employment was understandably terminated after she made numerous fantastic[10] and delusional-sounding accusations of wrongdoing against the University, the University's alumni and the University's largest corporate donor.

For all the reasons just discussed, Plaintiff has not plausibly alleged any actionable claim against Defendants.

<u>Leave to Replead is Denied</u>

Although Plaintiff did not request a further opportunity to replead in the event that the Court granted Defendants' motions to dismiss, the Court finds that leave to replead would be futile for the reasons discussed above. Specifically, Plaintiff's claims are

---

[9] Plaintiff expressly alleges that her supervisor sexually harassed her in retaliation after she told him about her discovery of the alleged criminal activity. *See*, Compl. at p. 4 ("I told Morgan and Holly I though my boss's actions toward me were in retaliation for me pointing out criminal activity at the University which involved Paychex, the University's largest donor.").
[10] "Fantastic: a : based on fantasy (see fantasy entry 1 sense 2) : not real." Merriam-Webster Dictionary.

18

patently frivolous, and no amount of re-pleading can cure that problem.

## CONCLUSION

Plaintiff's applications for appointment of counsel (ECF Nos. 2 & 14) and her application for leave to proceed *in forma pauperis* (ECF No. 15) are denied. Defendants' motions to dismiss (ECF Nos. 3, 8, 23) are granted. The action is dismissed with prejudice. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated: Rochester, New York
December 14, 2020

ENTER:

CHARLES J. SIRAGUSA
United States District Judge